UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

CITY OF SHORELINE, WASHINGTON,

Plaintiff,

vs.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, and SEAN DUFFY,
in his official capacity as the Secretary of
Transportation,

Defendants.

Case No. 2:26-cv-1311

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

## I.     INTRODUCTION

1.     For more than a century, Congress has used its constitutional authority to enact numerous statutes that direct federal funding to the States to promote the development, maintenance, and safety of our nation's transportation infrastructure. State and local governments have relied on these federal funding programs—totaling more than $100 billion annually—to support the roads, highways, railways, airways, ferries, and bridges that connect their communities and carry their residents to their workplaces and their homes.

2.     Plaintiff City of Shoreline ("Shoreline" or "the City") is one such recipient of federal funding from the Department of Transportation's ("DOT") Federal Highway Administration ("FHWA"). In 2023, Shoreline was awarded a $20 million grant under the

COMPLAINT-1

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

FHWA's Rebuilding American Infrastructure with Sustainability and Equity ("RAISE") Program. Shoreline's grant was intended to fund multimodal transportation infrastructure improvements around a regional transit station located in a rapidly growing area of the city. These improvements would vastly improve safety for the thousands of pedestrians, cyclists, and motorists that travel through the area daily, as well as Shoreline's connection to the greater Seattle area, where the majority of its residents work. Based on its RAISE grant, Shoreline is in the midst of acquiring properties and planning construction for the multiple phase project.

3.      In recent months, DOT has disrupted this critical work. Rather than faithfully carrying out the RAISE program Congress created, DOT is now forcing grantees like Shoreline to agree to various illegal and irrelevant conditions and to certify compliance with requirements unrelated to their ability to execute the grant. These new conditions have no grounding in the RAISE program's implementing statute(s) and do not effectuate the program's purposes. Instead, these conditions seek to advance the Administration's wholly unrelated ideological goals— including to end "diversity, equity, inclusion, and accessibility" and deny transgender people's identities. Worse yet, DOT has imposed these conditions in a manner expressly designed to create contradictions with state laws and requirements and expose Shoreline to civil and criminal liability under the False Claims Act ("FCA").

4.      Specifically, and as set out below, Shoreline challenges the following conditions: certifying that the grant recipient does not operate any diversity, equity, and inclusion initiatives that violate applicable federal anti-discrimination laws or promote "gender ideology"; and requiring Shoreline's agreement that its compliance in all respects with federal nondiscrimination laws is material to the federal government's payment decisions for purposes of the FCA.

5.      These new conditions put Shoreline in an untenable catch-22: The City can either reject the newly and improperly imposed (and impossibly vague) funding conditions, thus risking losing its committed federal grants and contracts and halting the subsequent phases of this vital planned project entirely—resulting in the loss of millions of dollars, delaying crucial

COMPLAINT-2

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

improvements, and prolonging unsafe transportation conditions around what will no doubt become one of the busiest local transit hubs within City limits—or it can accept the conditions and face unjustified FCA investigations and lawsuits, as well as significant financial hardship and uncertainty.

6. Defendants cannot lawfully put Shoreline to that choice. In our constitutional system, Congress makes the laws. The executive branch cannot unilaterally leverage funding Congress appropriated for specific purposes to advance the executive's own unrelated policy goals. Separation of powers does not allow such action.

7. Defendants' attempts to impose the new grant conditions also violate the Administrative Procedure Act ("APA"). Defendants have exceeded their authority, acted in conflict with governing law, failed to follow required rulemaking procedures, and acted arbitrarily and capriciously. Congress did not authorize DOT to impose new grant funding conditions. The new grant conditions are unrelated to and will not assist in effectuating the purposes of the funding or the RAISE program. The new grant conditions also are void for vagueness and violate due process.

8. Courts across the country have consistently ruled that grant conditions similar (or even identical) to those imposed on Shoreline are unlawful and unconstitutional. Shoreline deserves nothing less than the same results.

## II.    PARTIES

9. Plaintiff City of Shoreline is a municipal corporation organized and existing under and by virtue of the laws of the State of Washington.

10. Defendant Sean Duffy is the Secretary of the United States Department of Transportation, the highest-ranking official in DOT, and is responsible for the decisions of DOT. He is sued in his official capacity.

11. Defendant Department of Transportation is an executive department of the United States federal government. 42 U.S.C. § 3532(a); 49 U.S.C. § 102(a). DOT has responsibility for

COMPLAINT-3

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

implementing the federal grant program at issue in this action, including through the Federal Highway Administration. DOT is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

### III.      JURISDICTION AND VENUE

12.      This Court has subject-matter jurisdiction to adjudicate these claims because this action arises under the Constitution and laws of the United States, 28 U.S.C. § 1331, and because Defendants are United States agencies and officials, 28 U.S.C. § 1346(a)(2).

13.      This Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201–2202, 5 U.S.C. §§ 705, 706, and the Court's inherent authority to enjoin federal officials from acting unlawfully.

14.      Venue is appropriate under 28 U.S.C. § 1391(e) in the Western District of Washington because Plaintiff resides in this district and will use and distribute federal funding in this district.

### IV.      FACTUAL AND LEGAL BACKGROUND

**A.      Congress Created DOT to Facilitate Speedy, Safe, and Efficient Transportation Nationwide.**

**1.  FHWA's RAISE Grant Program**

15.      Congress established DOT in 1966 "to assure the coordinated, effective administration of the transportation programs of the Federal Government." Department of Transportation Act, 1966, Pub. L. 89-670, 80 Stat. 931. DOT administers both competitive and formula grant programs. In administering grant programs, DOT often acts through its operating administrations, including FHWA. By law, the DOT Secretary is responsible for all acts taken by its operating administrations and the administrators of FHWA report directly to the DOT Secretary. 49 U.S.C. § 104(b)(1), (c)(1); *see also* 49 C.F.R. pt. 1 (organization and authority of DOT).

16.      Congress has established by statute a variety of grant programs administered by DOT, acting through FHWA, that provide federal funds to state and local governments for road

COMPLAINT-4

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

and street infrastructure projects. These include, but are not limited to, programs codified in Title 23 of the U.S. Code and the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 429.

17.    The Infrastructure Investment and Jobs Act included the Local and Regional Project Assistance Program, which authorized the DOT Secretary to award grants for "capital investments in surface transportation infrastructure." 49 U.S.C. § 6702(b)(1). Congress instructed the DOT Secretary to consider, as the "primary selection criteria" for a grant, the extent to which a project: (a) improves safety; (b) improves environmental sustainability; (c) improves the quality of life of rural areas or urbanized areas; (d) increases economic competitiveness and opportunity, including increasing tourism opportunities; (e) contributes to a state of good repair; and (f) improves mobility and community connectivity. 49 U.S.C. § 6702(d)(3).

18.    Congress further instructed the DOT Secretary to consider "additional selection criteria," including the extent to which (a) the project sponsors collaborated with other public and private entities; (b) the project adopts innovative technologies or techniques (including (i) innovative technology; (ii) innovative project delivery techniques; and (iii) innovative project financing); (c) the project has demonstrated readiness; and (d) the project is cost effective. 49 U.S.C. § 6702(d)(4).

19.    Congress also required that DOT's evaluation of whether each application meets the statutory selection criteria or criteria "otherwise established by the Secretary" must be "through a methodology that is discernible and transparent to the public." 49 U.S.C. § 6702(d)(5)(A).

20.    To implement the Local and Regional Project Assistance Program, DOT created the RAISE program.[1]

21.    In fulfillment of the statutory authorization of FHWA grant programs, including the RAISE Program, Congress annually appropriates funding for FHWA grants. In appropriations

---

[1] On or about January 27, 2025, the Trump Administration renamed the RAISE program to the Better Utilizing Investments to Leverage Development ("BUILD") program. Fed. Highway Admin. Freight Mgmt. and Operations Office of Operations, *BUILD Discretionary Grants* (last updated July 1, 2025), https://perma.cc/A22L-V5BA (captured Apr. 10, 2026).

COMPLAINT-5

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

legislation, Congress sets forth priorities and directives to the DOT Secretary with respect to transportation funding, but Shoreline is not aware of Congress ever imposing or authorizing directives for or conditions on FHWA grants related to a prohibition on diversity, equity, and inclusion ("DEI"), diversity, equity, inclusion, and accessibility ("DEIA"), or gender identity. *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1835–1842; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 697–705; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 5109–5117; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 315–324; Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, 139 Stat. 9–47; Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026, Pub. L. 119-37, 139 Stat. 495–655; Consolidated Appropriations Act, 2026, Pub. L. 119-75.

22.     On or about December 14, 2022, DOT issued a Notice of Funding Opportunity ("NOFO") for Fiscal Year ("FY") 2023 RAISE grants, authorized under the Infrastructure Investment and Jobs Act, Pub. L. 117-58, Nov. 15, 2021, 135 Stat. 429. The DOT amended the FY 2023 NOFO on January 3, 2023. U.S. Dep't of Transp., *Notice of Funding Opportunity for the Department of Transportation's National Infrastructure Investments (i.e., the Rebuilding American Infrastructure with Sustainability and Equity (RAISE) Grant Program) under the Infrastructure Investment and Jobs Act ("Bipartisan Infrastructure Law"), Amendment No. 2* (Jan. 3, 2023), https://perma.cc/8JHV-RE8G (captured Apr. 10, 2026) ("Amended FY 2023 NOFO"). The Amended FY 2023 NOFO stated that RAISE funds "are for investments in surface transportation that will have a significant local or regional impact." *Id.* at 3.

23.     The Amended FY 2023 NOFO further specified that "[t]he Department seeks to fund projects under the RAISE Program that improve equity and environmental justice by addressing transportation-related disparities and climate change-related consequences consistent with Executive Order 13985, Advancing Racial Equity and Support for Underserved Communities Through the Federal Government (86 Fed. Reg. 7009) and Executive Order 14008, Tackling the

COMPLAINT-6

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

Climate Crisis at Home and Abroad (86 Fed. Reg. 7619)." *Id.* at 4. Furthermore, "[t]he Department also seeks to fund projects that, to the extent possible, target at least 40 percent of resources and benefits towards low-income communities, disadvantaged communities, communities underserved by affordable transportation, or overburdened communities." *Id.* at 4–5, n.4 (defining "overburdened community" as "Minority, low-income, tribal, or indigenous populations or geographic locations in the United States that potentially experience disproportionate environmental harms and risks" as the result of "both environmental and socio-economic stressors").

24.     The Amended FY 2023 NOFO outlines the criteria by which a project would be selected, specifically evaluating applications on a competitive basis for improvements to "safety; environmental sustainability; quality of life; mobility and community connectivity; economic competitiveness and opportunity including tourism; state of good repair; partnership and collaboration; and innovation." *Id.* at 1; *see also id.* at 38–57. This selection criteria mirrors the language contained in the enacting statute. 49 U.S.C. § 6702(d)(3).

25.     Shoreline submitted a RAISE grant application based on the requirements outlined in the Amended FY 2023 NOFO.

**2. Shoreline's RAISE Grant**

26.     On or around February 27, 2023, Shoreline applied for a FY 2023 RAISE grant through the Washington Department of Transportation ("WSDOT"), submitting a proposal for a $25 million award to improve transportation access to the Central Puget Sound Regional Transit Authority's ("Sound Transit") station on Shoreline's southern border. Shoreline's proposed project was entitled "West Side Transformation: Multimodal Connections to the Shoreline South Regional Transit Hub" ("West Side Transformation Project"). The West Side Transformation Project would complete multimodal connections from the west side of I-5 to the new Sound Transit light rail station on the east side.

27.     The West Side Transformation Project represents the culmination of an

COMPLAINT-7

intergovernmental collaboration dating back to 2015 between Shoreline, the State of Washington, King County, Sound Transit, and Shoreline's neighboring cities of Seattle, Bothell, Kenmore, and Lake Forest Park.

28. The West Side Transformation Project is the remaining part of a larger multimillion-dollar project funded by Connecting Washington, State Legislative Funding, Sound Transit System Access Funds, King County funds, and City of Shoreline General Funds. Shoreline will provide the local match for this portion of the intergovernmental project.

29. The West Side Transformation Project consists of three parts: (1) the 145th Street/State Route 523 Corridor Project (Phases 2 and 3), (2) the Off-Corridor Bike Network Project, and (3) the 148th Street Non-Motorized Bridge Project.



30. The 145th Street/State Route 523 Corridor Project ("Corridor Project") involves road improvements, including ADA accessibility sidewalk enhancements and curb ramps and creating left turn lanes and medians to reduce collisions and improve flow. The RAISE-funded

COMPLAINT-8

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

portion of the Corridor Project consists of two phases[2]: Phase 2 (Corliss Avenue to Wallingford Avenue) and Phase 3 (Wallingford Avenue to Linden Avenue). Both phases are currently in design and entering property acquisition phase, with construction expected to be substantially complete by 2028.

31.     The Off-Corridor Bike Network Project ("Bike Network Project") creates an off-corridor bike network parallel to 145th Street complete with pavement markings, intersection improvements, flashing beacons, speed cushions, signage, and connections to the 145th Corridor/148th Street Station bridge. The Bike Network Project is designed in conjunction with the Corridor Project to provide bicycle facilities that re-direct bicyclists off this busy corridor and onto slower paced neighborhood streets.

32.     Combined, these projects will alleviate traffic congestion, facilitate access to Sound Transit's regional light rail system, and enhance transportation mobility, reliability, and safety for all users: vehicles, pedestrians, bicyclists, transit, and freight.

33.     The Bridge Project creates a foot bridge over I-5, linking eastern and western portions of Shoreline by providing non-motorized (pedestrian and bicycle) connectivity to Sound Transit's Shoreline South/148th Light Rail Station and a planned bus rapid transit system along with current and future bicycle networks. This bridge connection will allow residents to access businesses, parks, and other amenities along with furthering the development of housing within the area. The Bridge Project will provide a vital new pedestrian/bike connection and will improve safety, reduce travel times, and improve access to regional light rail and bus transit at the Shoreline South/148th Station. Like the Corridor Project, the Bridge Project is multi-phased, with Phase 1 including land acquisitions and constructing the bridge landing and related connections on the east side of I-5; and Phase 2 constructing the bridge span, landing, and connections on the west side of I-5. Phase 1 will be completed in early 2026 and Phase 2 is anticipated to be completed in mid-

---

[2] Phase 1 (I-5 to Corliss Avenue) began construction in 2024 in coordination with the Interchange Project, which involves the installation of two roundabouts on either side of I-5. Neither Phase 1 nor the Interchange Project are part of Shoreline's RAISE grant. Phase 2 and 3 of the Corridor Project, which are funded by Shoreline's RAISE grant, is a continuation of the about to be completed Interchange Project.

COMPLAINT-9

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

2027.

34.     The West Side Transformation Project will substantially improve overall traffic flow and safety on the 145th Corridor and improve access to the future light rail station. As of 2023, 80% of Shoreline residents commute outside of the city limits for work, with the majority traveling into Seattle. The improvements that the West Side Transformation Project provides will become even more important, as this subarea, now known as the 148th Street Light Rail Station Subarea, will have nearly 4,000 housing units ready for occupancy in the next few years. This Subarea has the capacity to build 20,000 housing units (due to mandatory inclusionary zoning requirements enacted by the City, nearly 20% of these units are anticipated to be affordable) and opportunities for approximately 9,000 new employees.

35.     The West Side Transformation Project's proposed improvements would improve safety for a corridor with a history of high accident rates, with Shoreline's application noting hundreds of accidents occurring over the past decade. The West Side Transformation Project would improve safety for non-motorized travelers by widening sidewalks, improve accessibility for the disabled, and create bicycle infrastructure. The improvements would also provide environmental benefits via modern stormwater control techniques, low-impact development principles, and the creation of green space amenity zones that will counter the urban heat island effect with the planting of street trees.

36.     On or about June 23, 2023, Shoreline was awarded $20 million as the designated subrecipient under the FY 2023 RAISE program, requiring Shoreline to find alternative funding for the remaining $5 million requested but not awarded. As a RAISE grant subrecipient, Shoreline does not receive funding directly from FHWA. Instead, the funding is passed through WSDOT to Shoreline. Shoreline must submit the required documentation for disbursement of grant funds reimbursing the funded projects to WSDOT, who then submits the documentation to FHWA.

37.     In September 2024, a term sheet was executed that stated these funds would be used as follows:

COMPLAINT-10

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

| Project Portion | Funds |
| --- | --- |
| Construction of the 148th Street Non-Motorized Bridge | $6,729,789 |
| Right-of-Way Acquisition for 145th Street Corridor Phase 3 | $2,010,800 |
| Construction of 145th Street Corridor Phase 2 and Phase 3, including bicycle network | $11,259,321 |

The term sheet incorporated by reference FHWA's General Terms and Conditions for the FY 2023 RAISE Program, dated June 23, 2023. The term sheet further stated:

> The Recipient acknowledges that the General Terms and Conditions impose obligations on the Recipient and that the Recipient's non-compliance with the General Terms and Conditions may result in remedial action, terminating of the RAISE Grant, disallowing costs incurred for the Project, requiring the Recipient to refund to the USDOT the RAISE Grant, and reporting the non-compliance in the Federal-government-wide integrity and performance system.

There were no special conditions listed under Article 2 of the executed grant agreement.[3]

38. On or around October 3, 2024, a grant agreement for Shoreline's $20 million RAISE grant was executed. This grant agreement incorporated by reference the FHWA General Terms and Conditions for the FY 2023 RAISE Program dated October 1, 2024. The grant agreement also included the same provision from the term sheet regarding consequences for non-compliance.

B. **Defendants are Improperly Leveraging Federal Funding to Advance President Trump's Unrelated Ideological Vision in Contravention of the Constitution and the Administrative Procedure Act.**

39. Upon taking office in January 2025, President Trump issued a series of Executive Orders that aimed to effect sweeping social changes, including by directing agency heads to impose illegal and unrelated conditions on federal funding. Bolstering that effort, the Administration has announced it will weaponize the FCA to threaten massive liability to federal

---

[3] Shortly after execution, the grant agreement was amended between WSDOT and FHWA to incorporate only the 2 C.F.R. 200 changes that went into effect in October 2024.

COMPLAINT-11

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

funding recipients who do not comply with the Administration's conditions.

### 1. The Administration attacks diversity, equity, inclusion, and accessibility programs

40.    President Trump issued multiple executive orders attacking DEI and DEIA initiatives. *See, e.g.*, Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) (entitled "Ending Radical and Wasteful Government DEI Programs and Preferencing"); Exec. Order No. 14173, 90 Fed. Reg. 8663 (Jan. 21, 2025) (entitled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity") ("Anti-DEI Order").

41.    These orders reflect a far-ranging plan to eradicate legal diversity, equity, inclusion, and accessibility considerations and programs that further Congress's express goals. For instance, one order directs agencies to terminate all DEI and DEI offices, all "equity" programs, and all "equity-related" grants or contracts. Exec. Order No. 14151, § 2(b).

42.    Another order suggests steps to end what it deems "illegal" DEI and DEIA in the federal government and in the private sector. Anti-DEI Order §§ 3–4. The Anti-DEI Order revokes multiple diversity-related executive actions issued over the last half century; purports to "streamline[]" the federal contracting process by ordering a contracting compliance office to "immediately cease … [p]romoting diversity"; and directs the Office of Management and Budget to "[e]xcise references to DEI and DEI principles, under whatever name they may appear," from federal funding procedures and to "[t]erminate all 'diversity,' 'equity,'" and similar programs and activities. *Id.* § 3.

43.    The Anti-DEI Order does not define "DEI" or "DEIA," and provides no guidance on what might make such programs "illegal." Rather, it espouses a view unsupported by actual law or jurisprudence that "illegal" DEI is widespread: it laments that "critical and influential" institutions—including "the Federal Government, major corporations, financial institutions, the medical industry, large commercial airlines, law enforcement agencies, and institutions of higher education"—have adopted "dangerous, demanding, and immoral" DEI or DEIA programs "that

COMPLAINT-12

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

can violate the civil-rights laws." *Id.* § 1.

44.     Despite the lack of clarity on what criteria would turn a legal DEI program into an "illegal" one, the Anti-DEI Order requires federal agency heads to "include in every contract or grant award" a term requiring each counterparty or grant recipient to "certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.* § 3(iv)(B). The requirement that recipients not operate "*any* programs promoting DEI" is not limited to recipients' use of the federal funds that are the subject of the contract or grant, but extends to all recipient activities. *Id.* (emphasis added).

45.     The Anti-DEI Order mandates that a grant recipient comply with all applicable Federal anti-discrimination laws and declares that this compliance is "material" for purposes of the government's distribution of funds according to the FCA. The Order thus seeks to force grant recipients to concede, in advance, an essential element of an FCA claim—materiality—without regard to the facts and circumstances of the award, program, or performance at issue.

46.     The Anti-DEI Order directs agencies to couple these contract and grant terms with liberal use of investigations and legal actions "to deter DEI programs or principles … that constitute illegal discrimination or preferences." Anti-DEI Order § 4. The Order is thus a brazen attempt to allow the government to use FCA investigations and legal actions to target organizations that have missions or perform work that the government disfavors.

47.     On February 5, 2025, then-Attorney General Pamela Bondi sent a letter to all employees of the Department of Justice ("DOJ"). Mem. from Pamela Bondi, Att'y Gen., to All Dep't of Just. Emps., *Ending Illegal DEI and DEIA Discrimination and Preferences* (Feb. 5, 2025), https://perma.cc/KH9Y-A2VQ (captured June 12, 2025) ("Bondi Memo"). The memo stated that "the Department of Justice's Civil Rights Division will investigate, eliminate, and penalize illegal DEI and DEIA preferences, mandates, policies, programs, and activities in the private sector and in educational institutions that receive federal funds." *Id.* The Bondi Memo does not define "DEI" or "DEIA" or explain what makes a DEI or DEIA program illegal.

COMPLAINT-13

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

48.    The DOJ next announced its plans to use the FCA as a "weapon" in combating DEI and DEIA. Mem. from Todd Blanche, Deputy Att'y Gen., to Heads of Dep't Components and U.S. Att'ys, *Civil Rights Fraud Initiative* (May 19, 2025), https://perma.cc/3W6K-FGHA (captured June 12, 2025) ("Blanche Memo"). The Blanche Memo describes the FCA as DOJ's "primary weapon" in combatting government waste, fraud, and abuse, and it promises to "vigorous[ly] enforce[e]" the FCA "against those who defraud the United States by taking its money while knowingly violating civil rights laws." The memo orders each of the 93 U.S. Attorneys' offices around the country to assign an attorney to this initiative.

49.    The Blanche Memo states that the "FCA is implicated whenever a federal contractor or recipient of federal funds knowingly violates civil rights laws. . . and falsely certifies compliance with such laws." *Id.* It also broadly characterizes as unlawful any "knowing [] engag[ement] in racist preferences, mandates, policies, programs, and activities, including through diversity, equity, and inclusion (DEI) programs that assign benefits or burdens [based] on race, ethnicity, or national origin." *Id.*

50.    The Blanche Memo seeks to mobilize an FCA strike force, "strongly encourag[ing]" private parties to file suits under the FCA's *qui tam* provision, and encourages the public to report information about "discrimination by federal-funding recipients" to DOJ. *Id.* The Blanche Memo also states that the initiative will engage the DOJ's Criminal Division, *id.*, suggesting that DOJ will invoke the FCA's criminal penalty provisions, 18 U.S.C. § 287.

51.    The Blanche Memo does not explain when DEI would be considered "illegal," but a press release announcing the Initiative broadly warns institutions not to "promote divisive DEI policies." U.S. Dep't of Just., *Press Release: Justice Department Establishes Civil Rights Fraud Initiative* (May 19, 2025), https://perma.cc/ZS6R-B8E9 (captured June 24, 2025).

52.    A June 11, 2025, memo announcing the DOJ Civil Division's enforcement priorities further confirms the Administration's plans to aggressively use the FCA as a weapon in "advanc[ing] the Administration's policy objectives." Mem. from Brett A. Shumate, Asst. Att'y

COMPLAINT-14

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

Gen., to Civil Division Employees, *Civil Division Enforcement Priorities* (June 11, 2025), https://perma.cc/SV3A-NE9F (captured June 26, 2025).

### 2. The Administration attacks transgender rights

53. The Administration has also launched a broadside attack on the rights of transgender people that, if effectuated by plaintiffs, would violate numerous municipal, state, and federal protections by preventing individuals who happen to share this marginalized characteristic from enjoying equal benefit of publicly funded programs.

54. On January 30, 2025, the President issued Executive Order No. 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025) ("Gender Ideology Order"). That Order announces that "the policy of the United States" is "to recognize two sexes, male and female," that are "not changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2. It decries "the erasure of sex" in both "policy" and "language," and it commits to using what the Administration considers "accurate language and policy that recognize women are biologically female, and men are biologically male." *Id.* § 1.

55. The Gender Ideology Order defines "gender ideology" as an ideology that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the *false claim* that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this *false claim* as true." *Id.* § 2(f) (emphasis added). It states that "[g]ender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex," and that "[g]ender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body." *Id.* § 2(f). And it states that "gender identity reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." *Id.* § 2(g). The Order's definition is not

COMPLAINT-15

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

grounded in science and does not address the conflicts it creates with policies and procedures that respect the existence and rights of transgender people.

56. To accomplish its ideological vision, the Gender Ideology Order makes a host of directives, including requiring federal agency heads to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." *Id.* § 3(e). The Gender Ideology Order states that "[f]ederal funds shall not be used to promote gender ideology" and requires each agency to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* § 3(g).

57. The Gender Ideology Order also claims that Title IX of the Educational Amendments Act does not require "gender-identity based access to single-sex spaces" and expresses a view that such access "has harmed women." *Id.* § 3(f).

58. The Gender Ideology Order directs the Attorney General to "ensure … the right to single-sex spaces in" federally funded entities covered by the Civil Rights Act of 1964 and directs a host of federal agencies to "prioritize" enforcement of that right. *Id.* § 5.

**C.     Defendants Add Unlawful Conditions to Grant Awards**

59. DOT has applied the Executive Orders by imposing new and unlawful conditions on grant awards implemented by FHWA, and new agency-wide policy for all DOT awards (collectively, "DOT Conditions").

**1.  DOT-wide Conditions**

60. Executive agency memoranda and letters make clear that the Trump Administration's conception of an "illegal" DEI program is contrary to actual nondiscrimination statutes and is inconsistent judicial interpretation of those statutes. For instance, a February 5, 2025 letter from Attorney General Pam Bondi to DOJ employees states that DOJ's Civil Rights Division will "penalize" and "eliminate" "illegal DEI and DEIA" activities and asserts that such activities include any program that "divide[s] individuals based on race or sex"—potentially reaching affinity groups or teaching about racial history. Letter from Pam Bondi, Attorney General, to all

COMPLAINT-16

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

DOJ Employees (Feb. 5, 2025), https://perma.cc/24HF-SY4T (captured Apr. 10, 2026).

61.    That broad conception is confirmed in a letter from DOT Secretary Sean Duffy to all recipients of DOT funding stating that "[w]hether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called [DEI] goals, presumptively violates Federal Law." Letter from Sean P. Duffy, Sec'y of Transp., to All Recipients of U.S. Dep't of Transp. Funding (Apr. 24, 2025), https://perma.cc/3KAT-FDJK (captured Apr. 10, 2026) ("Duffy Letter").

62.    The Duffy Letter issued to "all recipients" of DOT funding announced DOT's "policy" of imposing immigration enforcement and anti-DEI conditions on all DOT-funded grants as a requirement of receiving funding. The Duffy Letter makes clear that DOT interprets federal nondiscrimination law to presumptively prohibit "any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called [DEI] goals." It further asserts that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law."

63.    The Duffy Letter to all recipients of DOT grants (including the FHWA grants) further addresses the broad scope of the Administration's anti-DEI agenda and how it expands and conflicts with established interpretations of federal nondiscrimination law, taking the position that any policy, program, or activity "designed to achieve so-called [DEI] goals"—even if "described in neutral terms"—"presumptively" violates federal nondiscrimination laws. The Duffy Letter also threatens "vigorous[] enforcement," ranging from comprehensive audits, claw-back of grant funds, and termination of grant awards to enforcement actions and loss of any future federal funding from DOT.

64.    Pursuant to the new policy set forth in the Duffy Letter, DOT and its operating

COMPLAINT-17

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

administrations have attached substantially similar conditions relating to discrimination, immigration enforcement, and executive orders to all grant agreements.

65. Additionally, DOT has sought to terminate grants it believes are contrary to Executive Orders, including the Anti-DEI Order.

66. On or about March 11, 2025, Secretary Duffy issued an internal directive to the Heads of Secretarial Offices and Operating Administrations ("Duffy Memo"). The Duffy Memo instructed offices to review "competitive award selections made after January 20, 2021, that do NOT have fully obligated grant agreements or cooperative agreements in place." Duffy Memo at 1 (emphasis in original).

67. The Duffy Memo stated that the focus of the review was to "identify project scope and activities that are allocating funding to advance climate, equity, and other priorities counter to the Administration's Executive Orders." Id.

68. Specifically, the Duffy Memo sought to "identify programs for which award selections may have included any of the following elements: equity activities, Diversity, Equity, and Inclusion (DEI) activities, climate change activities, environmental justice (EJ) activities, gender-specific activities, when the primary purpose is bicycle infrastructure (i.e., recreational trails and shared-use paths, etc.), electric vehicles (EV), and EV charging infrastructure." Id. at 2.

69. It further required "project-by-project" review of any "project scope elements for potential removal" if the project met the following criteria: "[s]tatutory language includes equity requirements, climate considerations, or bicycle infrastructure; NOFO mandatory evaluation criteria includes equity and/or climate requirements; [or] [e]ligible activities included bicycle infrastructure, EV and/or EV charging infrastructure." Id.

70. Following this project-by-project review, the Duffy Memo instructs DOT and FHWA leadership to decide if projects could continue in their current form, be revised with a reduced or modified scope, or be canceled entirely. Id. at 2–3.

COMPLAINT-18

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

**2.   New FHWA Conditions**

71.     On April 23, 2025, the FHWA issued Competitive Grant Program General Terms and Conditions purportedly applicable to all FHWA competitive grants.[4] These terms and conditions were modified on November 4, 2025 ("2025 FHWA General Terms and Conditions") to remove references to immigration enforcement conditions.[5] The November 4, 2025, version is the current operative version.

72.     The 2025 FHWA General Terms and Conditions imposed a new condition on all FHWA competitive grants (including the RAISE program) implementing President Trump's directive, as set out in the DEI Order and further explained in the Duffy Letter, to condition federal grant funds on recipients' agreement not to promote DEI and to concede this requirement is material for purposes of the FCA ("FHWA Discrimination Condition"). While FHWA grants have long required compliance with nondiscrimination laws and have been subject to the FCA, the 2025 FHWA General Terms and Conditions provide:

> (b) Pursuant to Section (3)(b)(iv)(A), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the FCA].

> (c) Pursuant to Section (3)(b)(iv)(B), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

73.     The Exhibits to the 2025 FHWA General Terms and Conditions—dated November 4, 2025 and applicable to FHWA competitive grants—further require the recipient to assure and certify that it will "comply with all applicable Federal laws, regulations, executive orders, policies,

---

[4] U.S. Dep't of Transp., *BUILD FY 2025 FHWA General Terms and Conditions (April 23, 2025)*, last updated May 5, 2025, https://www.perma.cc/PT95-GRC5 (captured Apr. 10, 2026).

[5] U.S. Dep't of Transp., *BUILD FY 2025 FHWA General Terms and Conditions (November 4, 2025)*, last updated Nov. 20, 2025, https://www.perma.cc/E87V-TYAZ (captured Apr. 10, 2026).

COMPLAINT-19

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project" (the "FHWA EO Condition").6 The Exhibits list President Trump's Anti-DEI Order and Gender Ideology Order (among other recent Trump Administration executive orders) as "provisions" purportedly "applicable" to FHWA competitive grant agreements, with no explanation of how those Orders or statutes relate to highway grants or even apply to local governments.

74. The Duffy Letter to all recipients of DOT grants (including the FHWA grants) further addresses the broad scope of the Administration's anti-DEI agenda and how it expands and conflicts with established interpretations of federal nondiscrimination law, taking the position that any policy, program, or activity "designed to achieve so-called [DEI] goals"—even if "described in neutral terms"—"presumptively" violates federal nondiscrimination laws. The Duffy Letter also threatens "vigorous[] enforcement," ranging from comprehensive audits, claw-back of grant funds, and termination of grant awards to enforcement actions and loss of any future federal funding from DOT.

### 3. New RAISE Program Conditions

75. On November 1, 2024, the DOT issued a FY 2025 NOFO for RAISE grants. DOT, *FY 2025 Notice of Funding Opportunity, Better Utilizing Investments to Leverage Development (BUILD) Grant Program* (Nov. 1, 2024), https://perma.cc/R8XV-N4XK (captured Apr. 10, 2026) ("FY 2025 NOFO"). On January 24, 2025, DOT issued an amended NOFO with several key changes. DOT, *FY 2025 Notice of Funding Opportunity, Better Utilizing Investments to Leverage Development (BUILD) Grant Program, Amendment No. 1* (Jan. 24, 2025), https://perma.cc/9V49-249C (captured Apr. 10, 2026) ("Amended FY 2025 NOFO"). First, DOT renamed the RAISE Program to the Better Utilizing Investments to Leverage Development ("BUILD)" Program. *Id.* at 5, 6. The amendment also "[a]lign[ed] the NOFO with new Executive Orders," including the Anti-DEI Order. *Id.* at 5, 6–7, 47–48. In particular, the Amended FY 2025 NOFO "[c]larifies all grant

---

6 U.S. Dep't of Transp., *Exhibits to FHWA Grant Agreements under the Fiscal Year 2025 BUILD Program*, November 4, 2025, https://www.perma.cc/9USM-P9DJ (captured Apr. 10, 2026).

COMPLAINT-20

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

agreements or contracts *must* include terms that are in compliance with Section 3(C)(iv) of the [Anti-DEI Order.]" *Id.* at 7 (emphasis added). The Amended FY 2025 NOFO imposes a new condition requiring recipients to agree that their "compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code" and that they "[do] not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.* at 48.

76.    The Amended FY 2025 NOFO also altered the selection criteria for RAISE grants, deleting considerations of climate change, environmental justice, equity, and disadvantaged/underserved communities, among other things. *Compare* FY 2025 NOFO at 31–48 *with* Amended FY 2025 NOFO at 30–43. The DOT similarly removed "equity analysis" from the listed examples of eligible planning projects, as well as references to "equity," "climate and sustainability," "environmental justice," and considerations of disadvantaged communities impacted by climate change, pollution, and environmental hazards through the Amended FY 2025 NOFO. *Compare* FY 2025 NOFO at 12, 14–15, 21, 23, 53–55 *with* Amended FY 2025 NOFO at 13, 15–16, 21, 23, 47–48.

77.    Additionally, the Amended FY 2025 NOFO changed the definition of "Historically Disadvantaged Communities." *Id.* at 7. Previously, Historically Disadvantaged Communities were defined as (a) those identified as disadvantaged in the White House Council on Environmental Quality's Climate & Economic Justice Screening Tool, which identifies such communities that have been marginalized by underinvestment and overburdened by pollution, and (b) any Federally Recognized Tribe or Tribal entity, whether or not they have land. FY 2025 NOFO at 10. The Amended FY 2025 NOFO redefined Historically Disadvantaged Communities to have the same definition as "Area of Persistent Poverty." Amended FY 2025 NOFO at 11.

78.    On or around December 15, 2025, DOT issued a NOFO for Fiscal Year 2026. DOT, *FY 2026 Notice of Funding Opportunity, Better Utilizing Investments to Leverage Development (BUILD) Grant Program* (Dec. 15, 2025), https://perma.cc/V7EC-EXYR (captured Apr. 10, 2026)

COMPLAINT-21

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

("FY 2026 NOFO").

79.    The FY 2026 NOFO retains the Amended FY 2025 NOFO's deletion of considerations of and references to climate change, environmental justice, equity, and disadvantaged/underserved communities. The FY 2026 also includes some of the same grant conditions and requirements as the Amended FY 2025 NOFO—in particular, requiring a recipient to "agree that its compliance in all respects with applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the FCA, 31 U.S.C. 3729(b)(4)]" and to "certify that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws" pursuant to the Anti-DEI Order, "[e]xcept where prohibited by court order . . . ." *Id.* at 48–49. The FY 2026 NOFO goes on to state: "To the extent a court order bars the implementation or enforcement of one or more of the provisions with respect to a particular applicant or recipient, [DOT] will not implement or enforce the relevant provision(s) against that applicant or recipient for as long as the order remains in place." The FY 2026 NOFO makes clear that Defendants intend to continue applying extra-statutory conditions to RAISE grantees in the absence of a court order preventing them from doing so.

80.    On or around September 1, 2025—approximately one year after the execution of the term sheet, and eleven months after the execution of Shoreline's RAISE grant agreement—Shoreline received an e-mail from WSDOT Local Programs, explaining that FHWA had updated the RAISE grant agreement template and particularly noting changes to special terms and conditions in Article 2 of the agreement. The amended Article 2 stated that DOT would not enforce or impose the added immigration enforcement special conditions included in the 2025 FHWA General Terms and Conditions pursuant to an injunction entered in *State of California v. Duffy*, No. 1:25-cv-00208-JJM-PAS (D.R.I.) (June 19, 2025).

81.    The September 1, 2025 WSDOT e-mail also attached a draft grant agreement for Shoreline's RAISE grant. This draft agreement incorporated by reference the 2025 FHWA General

COMPLAINT-22

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

Terms and Conditions described above. The grant agreement also included the same provision from the term sheet and prior agreement regarding consequences for non-compliance.

82.     After receiving the September 1, 2025 e-mail from WSDOT, Shoreline sought clarification regarding the amended 2025 FHWA General Terms and Conditions in conversations with WSDOT. In response to subsequent written questions regarding the proposed updates to the RAISE fund agreement, WSDOT responded that changes to the FHWA agreement language were "not allowed," and Shoreline had to sign the amendment in order to receive the RAISE funds. On December 18, 2025, WSDOT again informed Shoreline that the FHWA conditions language could not be amended.

83.     Neither the statutory provisions creating the FHWA grants, the relevant appropriations acts, nor any other legislation authorizes the FHWA or DOT to condition these funds on the recipient's certification that it does not "promote DEI"; its compliance with Executive Orders, including the Anti-DEI and Gender Ideology Orders; or its admission that its compliance with this prohibition is material for purposes of the FCA. Federal grant recipients must comply with nondiscrimination and other federal laws. But executive orders and letters from agency heads cannot change what these laws require under existing court decisions.

**4.   Court Injunctions Against Unlawful Grant Conditions**

84.     This Court has already preliminarily enjoined the DOT Conditions that FHWA recipients cannot use grants: (1) to promote "gender ideology"; (2) to fund and promote abortion; (3) to facilitate "illegal immigration"; and (4) to promote DEI policies, mandates, and programs, as reflected in Executive Orders. *City of Seattle v. Trump*, No. 2:25-cv-01435-BJR, --- F. Supp. 3d ---, 2025 WL 3041905 (W.D. Wash. Oct. 31, 2025) (enjoining HUD, DOT, and Department of Homeland Security from enforcing anti-DEI and gender ideology conditions); *Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-cv-00814-BJR, --- F. Supp. 3d ---, 2025 WL 2322763 (W.D. Wash. Aug. 12, 2025) (enjoining HUD, DOT, and HHS from enforcing anti-DEI, gender ideology, anti-abortion, and immigration-related conditions).

COMPLAINT-23

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

85.     Other courts across the country have enjoined federal agencies—including DOT—from enforcing unlawful conditions similar to the DOT Conditions described above. *See, e.g.*, *State of California v. Duffy*, No. 1:25-cv-00208-JJM-PAS, --- F. Supp. 3d ---, 2025 WL 3072541 (D.R.I. Nov. 4, 2025) (granting plaintiffs summary judgment and enjoining DOT from enforcing immigration-related conditions); *New York v. U.S. Dep't of Justice*, No. 1:25-cv-00345-MSM-PAS, --- F. Supp. 3d ---, 2025 WL 2618023 (D.R.I. Sept. 10, 2025) (D.R.I. Sept. 10, 2025) (enjoining Departments of Justice, Labor, Education, and Health and Human Services from enforcing immigration-related conditions); *Illinois v. FEMA*, No. 25-cv-00206, --- F. Supp. 3d ---, 2025 WL 2716277 (D.R.I. Sept. 24, 2025) (enjoining DHS from enforcing immigration-related conditions); *R.I. Coal. Against Domestic Violence, et al. v. Kennedy, Jr.*, No. 25-cv-342-MRD-PAS, 2025 WL 2988705 (D.R.I. Oct. 23, 2025) (enjoining HUD from enforcing anti-DEI, gender ideology, and anti-abortion conditions).

86.     Despite these court orders, on December 15, 2025, DOT posted the RAISE NOFO for Fiscal Year 2026 ("FY 2026 NOFO"). *See* DOT, *FY 2026 Notice of Funding Opportunity, Better Utilizing Investments to Leverage Development (BUILD) Grant Program* (Dec. 15, 2025), https://perma.cc/DCV6-ZR3S (captured Apr. 10, 2026). This NOFO continues to include post-award requirements substantively identical to the FHWA Discrimination Condition, including compliance with the Anti-DEI Order.

**D.     Shoreline Faces an Impossible Choice of Certifying Compliance with Illegal Conditions or Forgoing Critical Federal Funding.**

87.     Defendants' imposition of the DOT Conditions places Shoreline in an impossible position. Shoreline must choose between foregoing funding that it has detrimentally relied upon for years in executing the West Side Transformation Project and accepting and certifying compliance with conditions that are unlawfully vague, in violation of other constitutional and statutory requirements, and at odds with its values.

88.     Shoreline has invested millions of dollars into designing and constructing the

COMPLAINT-24

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

infrastructure improvements involved in various components of the 148th Street Station access improvements, including the West Side Transformation Project. These efforts are the culmination of over a decade's worth of local intergovernmental cooperation and hard work. Shoreline has already committed substantial resources to seeing these improvements—of which the RAISE-funded West Side Transformation Project is only a part—through. Work is well under way, with Shoreline already moving through the design phases into beginning construction, signing contracts, and acquiring properties (which resulted in displacement of households).

89.     Combined, these projects are estimated to cost almost $128 million. Phase 1 of the Corridor Project and the Interchange Project account for approximately $90 million, Phase 2 of the Corridor Project approximately $20 million, Phase 3 of the Corridor Project approximately $13 million, and related improvements to Shoreline's bicycle network that will be incorporated in the Corridor Project is approximately $1.24 million. RAISE grant funds comprise a significant portion of the costs for the West Side Transformation Project, contributing an estimated 28-67% of funding for the various phases of the Corridor Project, the Bike Network Project, and the Bridge Project.

90.     FHWA's actions have left Shoreline in a position of extreme uncertainty and risk. If Shoreline lost the RAISE funds, Phases 2 and 3 of the Corridor Project, and Phase 2 of the Bridge Project relating to the Bike Network Project would be unable to proceed unless alternative funding were secured—threatening the success of this long-standing regional intergovernmental endeavor. If Shoreline could not piecemeal together grant funding from other sources, it would need to provide the funds itself, resulting in other important city programs, services, and projects being compromised, delayed, or even terminated.

91.     Because Shoreline is already under contract for the entirety of the Bridge Project, without the RAISE funds and alternative funding, Shoreline could find itself in breach of contract for ongoing construction of the Bridge Project, resulting in further legal costs and litigation risk.

92.     The Corridor Project, the Bridge Project, and the Bike Network Project were anticipated to provide approximately 275 construction and professional service jobs during the

COMPLAINT-25

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

construction of these projects. Loss of these jobs would affect not only the individual workers and their participation in the local economy, but also Shoreline businesses that rely on these workers.

93.    Loss of the previously awarded federal funds and future potential funding will harm Shoreline, its residents, and the neighboring municipalities by delaying or preventing completion of projects that not only enhance mobility and safety but provide environmental benefits with improved stormwater treatments, the addition of green spaces, and reduction in emissions and fuel consumption from decreased traffic congestion and transportation mode shift. The loss of previously awarded federal funding will also cause budgetary uncertainty that disrupts the long-term planning required for the design and construction of transportation projects and require Shoreline to divert its own resources from other planned capital improvements or seek funding from other sources.

94.    If Shoreline does not agree to the DOT Conditions, the City would likely be forced to repay any expended federal funds to FHWA, as well as other federal and state funds. These funds were originally provided based on Shoreline's commitment to completing the Corridor Project, the Bridge Project, and the Bike Network Project. Unless Shoreline could piecemeal together other grant funds or redirect its own funds, these projects could remain incomplete for an indeterminable time period resulting in long-term mobility and safety impacts to both vehicle, transit, pedestrian, and bicycle traffic that utilize the 145th Street corridor on a daily basis, along with vacant properties being susceptible to vagrancy and having little to no resale value.

95.    Shoreline took on substantial risk in moving forward a suite of projects to provide a safe multimodal transportation system that, given the recently completed light rail station on this street and its freight network connectivity, benefits the entire region. Most funding sources for safety and multimodal corridor improvements are limited and alone cannot provide the funding needed to construct a large capital project. The RAISE grant made these projects possible, and without the RAISE funding, there is no clear path for completing these projects. Without the RAISE grant, Shoreline would be required to expend further resources to re-strategize and

COMPLAINT-26

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

determine what, how, and whether the improvements could be accomplished. If Shoreline loses RAISE funding and no longer has complete project funding for the projects, Shoreline may need to return other awarded funding secured through difficult competitive processes, which would negatively affect Shoreline's ability to be awarded funds in the future.

96.     The Corridor Project encompasses 145th Street/State Route 523, which has been identified as a high-injury corridor due to its high concentration of traffic-related serious injuries and fatalities over the past decade. During this time frame, there were 12 serious injuries and fatalities, which resulted in a concentration of 8.5 serious injuries and fatalities per mile. Without the Corridor Project, the Bridge Project, and the Bike Network Project, Shoreline anticipates the continuation of—and potential increase—in serious and fatal collisions. As more people utilize the 148th Street light rail station, more people will be at risk for traffic accidents.

## V.    CLAIMS FOR RELIEF

### COUNT I
### Violation of the Spending Clause and Separation of Powers

97.     The paragraphs above are incorporated and reasserted as if fully set forth here.

98.     This Court has inherent equitable power to enjoin executive conduct that violates the Constitution. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

99.     The Spending Clause of the Constitution provides: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States." U.S. Const. art. I, § 8, cl. 1. The Spending Clause vests the power of the purse, including the power to attach conditions to the expenditure of federal funds, exclusively with Congress. *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018)); *see* U.S. Const., art. I, § 8, cl. 1; id., § 9, cl. 7.

100.    Duly enacted statutes establish grant programs for specified purposes, and Congress has consistently appropriated funding for those programs. Nothing in those laws

COMPLAINT-27

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

authorizes the Executive Branch to impose the DOT Conditions. Defendants may not lawfully condition funding on the DOT Conditions, which are nowhere to be found in statute, and which Congress did not authorize Defendants to impose.

101. Defendants' imposition of each challenged condition violates the Spending Clause and separation of powers by infringing on Congress's legislative authority and power of the purse, failing to faithfully execute Congress's laws, and attempting to amend, modify, or partially veto duly enacted legislation.

## COUNT II
## Ultra Vires

102. The paragraphs above are incorporated and reasserted as if fully set forth here.

103. This Court has inherent equitable power to enjoin and declare unlawful executive ultra vires conduct. *R.I. Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 42 (1st Cir. 2002); *see also Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015); *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 718–19 (9th Cir. 2011). An agency acts ultra vires when it "plainly acts in excess of its delegated powers." *Fresno Cmty. Hosp. & Med. Ctr. v. Cochran*, 987 F.3d 158, 162 (D.C. Cir. 2021) (cleaned up).

104. No statute, constitutional provision, or other source of law authorizes Defendants to impose the DOT Conditions.

105. The DOT Conditions are ultra vires, and Defendants must be enjoined from implementing or enforcing them.

## COUNT III
## Violation of the Fifth Amendment Due Process Clause

106. The paragraphs above are incorporated and reasserted as if fully set forth here.

107. The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

108. Due process requires that parties "know what is required of them so they may act accordingly." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citing *United*

COMPLAINT-28

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

*States v. Williams*, 553 U.S. 285, 304 (2008)).

109. The DOT Conditions are unconstitutionally vague. They fail to provide grantees notice of what conduct is prohibited and fail to specify clear standards for enforcement, encouraging arbitrary and discriminatory application of the law.

110. The FHWA Discrimination Condition is unconstitutionally vague because it fails to provide fair notice of what constitutes a violation of federal antidiscrimination laws in view of the DOT Policy forbidding "promot[ion of] diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities that violate any applicable Federal antidiscrimination laws." No DOT policy or other guidance, nor the Anti-DEI Order, provides any detail on the Administration's view of what might make any given purported DEI or DEIA program violate antidiscrimination laws.

111. The FHWA EO Condition is unconstitutionally vague because, among other reasons, Executive Orders are issued by the President to direct the Executive Branch—they are not laws and do not impose legal requirements or obligations on private parties like federal grantees, leaving grantees to guess as to what it means to violate an Executive Order. In addition, it is unclear how Shoreline could comply with Executive Orders while also complying with its own local law. The FHWA EO Condition also purports to incorporate all executive orders, leaving grantees uncertain how to treat Executive Orders entirely irrelevant to their programs, including those that predate this administration.

112. The vagueness of these conditions threatens Shoreline's property interest in its grant funds and in its own non-federal funds that could be subject to FCA damages and penalties.

113. The DOT Conditions are unconstitutionally vague in violation of Fifth Amendment Due Process guarantee, and Defendants must be enjoined from enforcing or implementing them.

## COUNT IV
### Violation of the Tenth Amendment (Anti-Commandeering/Coercion)

114. The paragraphs above are incorporated and reasserted as if fully set forth here.

115. The Tenth Amendment provides that "[t]he powers not delegated to the United

COMPLAINT-29

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

States by the Constitution, nor prohibited to it by the States, are reserved to the States respectively, or to the people." U.S. CONST. amend X.

116.    Under the Tenth Amendment, the federal government may not "coerce[ ] a State to adopt a federal regulatory system as its own." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012). Coercion occurs when "pressure turns into compulsion." *Id.* at 580.

117.    Courts in the Ninth Circuit have found coercion under the Tenth Amendment where the application of executive orders "would have significant effects on [localities'] ability to provide services to their residents and … they may have no legitimate choice regarding whether to accept the government's conditions in exchange for those funds." *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 533 (N.D. Cal. 2017).

118.    The potential loss of all federal funding placed at risk by the DOT Conditions applying Executive Orders—specifically, the Anti-DEI and Gender Ideology Orders—here is coercive under the Tenth Amendment. The Orders thus violate the anti-commandeering principle of the Tenth Amendment.

119.    Shoreline is entitled to a declaration that the Anti-DEI and Gender Ideology Orders violate the anti-commandeering principle of the Tenth Amendment.

120.    Shoreline is further entitled to a preliminary and permanent injunction preventing all federal departments and agencies from enforcing or implementing the Orders by taking any action to withhold, freeze, or condition federal funds from Shoreline.

## COUNT V
### Violation of the Administrative Procedure Act: In Excess of Statutory Authority

121.    The paragraphs above are incorporated and reasserted as if fully set forth here.

122.    The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

123.    The inclusion of the new funding conditions in Shoreline's award is final agency action reviewable under 5 U.S.C. § 704. The DOT's decision to incorporate the DOT Conditions

COMPLAINT-30

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

in awards, as reflected in Shoreline's award agreement, is final. The inclusion of those conditions determines Shoreline's rights and obligations and produces legal consequences because it imposes requirements and restrictions on awardees as a condition of accepting the funding.

124. Congress has not authorized Defendants to impose any of the DOT Conditions. Defendants therefore acted in excess of their statutory authority in imposing them. *See Washington v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 3d 863, 868 (W.D. Wash. 2020) ("[A]dministrative agencies may not act outside the scope of the authority delegated to them by Congress.").

125. Defendants' imposition of the DOT Conditions in Shoreline's award must be declared unlawful and set aside as "in excess of statutory jurisdiction, authority, or limitations."

## COUNT VI
### Violation of the Administrative Procedure Act: Contrary to Law

126. The paragraphs above are incorporated and reasserted as if fully set forth here.

127. The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "not in accordance with law." 5 U.S.C. § 706(2)(A).

128. DOT's decision to impose the DOT Conditions on Shoreline's grant is a final agency action under 5 U.S.C. § 704, as it determines Shoreline's rights and obligations and produces legal consequences by requiring Shoreline to certify its adherence to these conditions to receive funding.

129. Through the 2025 FHWA General Terms and Conditions, DOT has sought to impose the Anti-DEI Order on Shoreline and to eliminate grant funding for recipients such as Shoreline that have DEIA programs and activities without defining what types of programs and activities are banned as "DEI" or "DEIA" and without any prior determinations of their illegality by the federal courts.

130. Through the 2025 FHWA General Terms and Conditions, DOT has also sought to impose the Gender Ideology Order on Shoreline and conditioned federal funds on a requirement that recipients refrain from engaging in "gender ideology," a vague term used by the federal government making it unclear how Shoreline is to comply.

COMPLAINT-31

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

131. DOT's actions are contrary to constitutional right, power, privilege, or immunity in violation of 5 U.S.C. § 706(2)(B), as more particularly described in Counts I and III above.

132. The DOT Conditions conflict with various existing statutes and regulations. For example, the DOT Conditions (including the requirement of compliance with the Anti-DEI and Gender Ideology Orders) conflict with DOT regulations requiring a recipient of grant funds "take affirmative action to remove or overcome the effects of . . . prior discriminatory practice or usage" where that "prior discriminatory practice or usage tends, on the grounds of race, color, or national origin to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination . . . ." 49 C.F.R. § 21.5(b)(7).

133. The DOT Conditions also conflict with Shoreline's own local resolutions, training, and programs.

134. On September 10, 2001, the Shoreline City Council adopted Resolution 176 declaring the City's commitment to embracing the increasing diversity and multiculturalism of its community; its values of mutual respect, collaboration, tolerance, and inclusiveness; and its support for a safe, fair, and equitable environment for all. *See* City of Shoreline, Wash., Res. No. 176 (Sept. 10, 2001).

135. On January 23, 2017, the Shoreline City Council unanimously adopted Resolution 401 declaring and reiterating the City of Shoreline to be an inviting, equitable, and safe community for all. The resolution states, "As leaders in the community, we have a special responsibility not to stay silent in the face of discrimination, harassment or hate against any of our residents, and we choose to be a leader in protecting human rights, equity, public safety and social well-being." City of Shoreline, Wash., Res. No. 401 (Jan. 23, 2017).

136. On November 30, 2020, the Shoreline City Council adopted Resolution 467 committing to becoming an anti-racist community by, among other things, "advocat[ing] locally for relevant policies that improve the condition of communities of color" and "support[ing] local, state, regional, and federal initiatives that advance efforts to dismantle systemic racism." City of

COMPLAINT-32

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

Shoreline, Wash., Res. No. 467 (Nov. 30, 2020).

137.    On February 24, 2025, the Shoreline City Council adopted Resolution 542, committing to protect the rights of and uplift the voices and contributions of all individuals, including LGBTQIA2S+ individuals. *See* City of Shoreline, Wash., Res. No. 542 (Feb. 24, 2025).

138.    As part of Shoreline's efforts to promote equity and social justice, in 2016, the City Council passed Ordinance 728, creating and funding the Diversity and Inclusion Coordinator position. This position supports the City's work of fostering an anti-racist, equitable, and multicultural organization. The coordinator has three main areas of focus: (1) increasing the capacity of City staff to promote service equity and inclusion, which includes mandatory staff training on institutionalized racism, working with diverse populations, and evaluating City policies and procedures through an equity lens; (2) increasing access of City information and services to diverse communities through focused outreach and community engagement using language specific resources and intentional and directed outreach to diverse populations; and (3) increasing community-based support for diverse communities by providing technical assistance and support to community groups and organizations serving diverse populations to promote multicultural and anti-racist efforts. *See* City of Shoreline, Wash., Ordinance No. 728 (Nov. 23, 2015).

139.    DOT's policy adopting the DOT Conditions, requiring certification of compliance with DOT Conditions for all DOT grants, and Defendants' imposition of those conditions on Shoreline's award, must be declared unlawful and set aside as "contrary to law" and "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

## COUNT VII
### Violation of the Administrative Procedure Act: Arbitrary and Capricious

140.    The paragraphs above are incorporated and reasserted as if fully set forth here.

141.    The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

142.    Defendants have made a final decision to impose the DOT Conditions on grants. That final agency action is reviewable under 5 U.S.C. § 704, as it determines an awardee's rights

COMPLAINT-33

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

and obligations and produces legal consequences by requiring awardees to accept the requirements and restrictions to receive funding.

143. Defendants provided no reasoned explanation for their decision to adopt the DOT Conditions, nor did they offer any reasonable explanation for including the DOT Conditions in Shoreline's award.

144. Defendants ignored the factors that Congress required the agencies to consider and considered factors that Congress did not permit them to consider.

145. Defendants failed to consider the serious reliance interests of Shoreline and the members of the public whom the City serves that are jeopardized by the imposition of the DOT Conditions.

146. In imposing the DOT Conditions, Defendants have failed to consider multiple important aspects of the problem. There is no indication that Defendants considered the detrimental impact of the DOT Conditions on the communities served by Shoreline, any alternative more limited policy change, or Shoreline's reasonable reliance on the funds or the reliance interests of communities served by grantees.

147. The funding conditions are also arbitrary and capricious because they are so vague that they do not give grantees adequate notice of what they must do to comply.

148. The DOT Conditions are also arbitrary and capricious because they conflict with binding agency regulations and local law and fail to acknowledge or address those conflicts.

**COUNT VIII**
**Violation of the Administrative Procedure Act:**
**Not in Observance of Procedure Required by Law**

149. The paragraphs above are incorporated and reasserted as if fully set forth here.

150. The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

151. As part of this requirement, an agency "must abide by its own regulations." *Fort Stewart Schs. v. Fed. Labor Rels. Auth.*, 495 U.S. 641, 654 (1990).

COMPLAINT-34

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

152.    DOT has adopted regulations and policies requiring it to proceed by notice-and-comment rulemaking. DOT regulations acknowledge the APA as the federal statute that governs DOT procedures for agency rulemaking and adjudication and provides for judicial review of final agency actions. 49 C.F.R. § 5.1. DOT's own operative Rulemaking Handbook notes that although the APA requires a notice and comment procedure in 5 U.S.C. § 553 exempts matters relating to grants. DOT nevertheless "applies notice and comment procedures to rulemakings establishing conditions for financial assistance in the same manner as these procedures are applied to other rulemakings not involving financial assistance." Dep't of Transp., *Rulemaking Handbook* 4–5 (May 2022), https://perma.cc/24EC-QGTB (captured Apr. 10, 2026). On March 10, 2025, Secretary Duffy signed a rulemaking order stating the following policy for DOT regulations: "Full public participation should be encouraged in rulemaking actions, primarily through written comment and engagement in public meetings. Public participation in the rulemaking process should be conducted and documented, as appropriate, to ensure that the public is given adequate knowledge of substantive information relied upon in the rulemaking process." Dep't of Transp., Order 2100.6B, https://perma.cc/T4JH-TMLN (captured Apr. 10, 2026).

153.    DOT has attached the DOT Conditions to grant awards, creating new substantive obligations and legal consequences for recipients. These DOT Conditions thus comprise a substantive rule.

154.    In imposing the DOT Conditions, DOT failed to comply with the notice-and-comment requirements set forth in its own regulations and policies and failed to observe procedures required by law.

155.    The imposition of the DOT Conditions must be declared unlawful and set aside as "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## VI.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.    Declare unlawful, vacate, and set aside the DOT Conditions;

COMPLAINT-35

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

B.     Declare unlawful, vacate, and set aside Defendants' decision to include the DOT Conditions in individual award programs and in individual awards;

C.     Stay the DOT Conditions in Defendants' policies, in any individual notices of funding opportunity, and in any awarded grants, pursuant to 5 U.S.C. § 705, and issue all other necessary and appropriate process to preserve status or rights pending conclusion of the review proceedings;

D.     Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from including any of the DOT Conditions or any substantively similar condition in any NOFOs or awards, from requiring or permitting any funding recipient to impose any of the DOT Conditions or any substantively similar condition on subrecipients, and from otherwise imposing the DOT Conditions or any substantively similar condition on any funding recipient;

E.     Award Plaintiff reasonable costs and attorneys' fees; and

F.     Grant any other relief that the Court deems fit and proper.

Dated: April 16, 2026          Respectfully submitted,

*/s/ Margaret King*

Margaret King      WA #34886
Julie Ainsworth-Taylor   WA #36777
**CITY OF SHORELINE**
17500 Midvale Avenue North
Shoreline, WA 98133
Phone: (206) 801-2221
Fax: (206) 801-2781
mking@shorelinewa.gov
jainsworth-taylor@shorelinewa.gov

Amy Powell*     NY #4339743
Gary DiBianco*   DC #458669
Kunyu Ching*    CA #292616
**LAWYERS FOR GOOD GOVERNMENT**
1319 F St. NW, Suite 301
PMB 181

COMPLAINT-36

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221

Washington, DC 20004
Phone: 404-913-5529
amy@lawyersforgoodgovernment.org
gary@lawyersforgoodgovernment.org
kunyu@lawyersforgoodgovernment.org

ATTORNEYS FOR PLAINTIFF

*pro hac vice motion forthcoming*

COMPLAINT-37

City of Shoreline
17500 Midvale Ave. N.
Shoreline, WA 98133
(206) 801-2221