The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CITY OF SEATTLE, *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>        Defendants.<br><br>――――――――――――<br><br>CITY OF SHORELINE,<br><br>        Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*,<br><br>        Defendants. | NO. 25-cv-1435-BJR<br>NO. 26-cv-1311-BJR<br><br>**ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION** |

## I.    INTRODUCTION

Currently before the Court are two motions: (1) Plaintiffs' Second Motion for Preliminary Injunction filed in *City of Seattle v. Trump*, Case No. 25-cv-1435-BJR and (2)

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 1

Plaintiff's Motion for a Preliminary Injunction filed in *City of Shoreline v. United States Department of Transportation*, Case No. 26-cv-1311-BJR. The motions were consolidated per the parties' stipulation. Having reviewed the parties' arguments, the record of the cases, and the relevant legal authority, the Court grants the motions. The reasoning for the Court's decision follows.

## II.    PROCEDURAL HISTORY

### A.    *City of Seattle v. Trump*

The City of Seattle filed its original complaint in July 2025, challenging the implementation of two Executive Orders issued by President Trump as applied to Seattle's federal grants: Executive Order No. 14173, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity"[1] ("DEI Order"), and Executive Order No. 14168, "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government"[2] ("Gender Order"). Seattle named as defendants the President, the United States, the Department of Justice ("DOJ"), Office of Federal Contract Compliance Programs ("OFCCP"), Office of Management and Budget ("OMB"), Department of Transportation ("DOT"), the Federal Transit Administration ("FTA"), United States Department of Homeland Security ("DHS"), United States Department of Housing and Urban Development ("HUD"), and various officials of those agencies. The city alleged that Defendants were attempting to implement or enforce two provisions of the Orders—Section 3(b)(iv) of the DEI Order, concerning certification

---

[1] Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 31, 2025).

[2] Exec. Order No. 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 30, 2025).

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 2

requirements for federal contractors and grant recipients, and Section 3(g) of the Gender Order, concerning the use of federal funds—by imposing unlawful conditions on federal grants awarded to it. Seattle asserted claims for declaratory and injunctive relief under the Administrative Procedure Act ("APA"), separation of powers doctrine, the Spending Clause, the Fifth Amendment, and the Tenth Amendment. Seattle thereafter moved for a preliminary injunction, which this Court granted on APA grounds and enjoined Defendants from enforcing the challenged grant conditions against the city.

Seattle later filed an amended complaint that added eight plaintiffs to the lawsuit: the Cities of Cleveland, Columbus, Durham, and Portland, and the Counties of Allegheny, Hennepin, Prince George's, and Ramsey (collectively "Seattle Plaintiffs"). The amended complaint also updates certain federal officer Defendants and adds additional agency Defendants and officials, including the Federal Aviation Administration ("FAA"), the Federal Highway Administration ("FHWA"), the Federal Railroad Administration ("FRA"), the United States Department of Health and Human Services ("HHS"), the Health Resources and Services Administration ("HRSA"), the United States Department of Agriculture ("USDA"), the Environmental Protection Agency ("EPA"), the United States Department of Energy ("DOE"), and the United States Department of Labor ("DOL").

Seattle Plaintiffs allege that they have or are entitled to over two billion in federal grant funds and Defendants are imperiling those funds by imposing conditions on the grants that are meant to implement and/or enforce Section 3(b)(iv) of the DEI Order and Section 3(g) of the

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 3

Gender Order. *See* Seattle Dkt. 42 ¶¶ 14–22. Seattle Plaintiffs filed a request for a preliminary injunction related to the amended allegations on May 1, 2026. Seattle Dkt. 61.[3]

**B.**      ***City of Shoreline v. United States Department of Transportation***

In April 2026, the City of Shoreline ("Shoreline") filed a separate action against DOT and Sean Duffy, in his official capacity as Secretary of Transportation. Shoreline Dkt. 2. Shoreline asserts that it is the recipient of a DOT grant and that DOT is requiring it to agree to new grant conditions incorporating the challenged provisions of the DEI and Gender Orders. Like Seattle Plaintiffs, Shoreline contends that Defendants' implementation of those conditions exceeds statutory authority, is contrary to law, is arbitrary and capricious, and violates the Constitution. Shoreline moved for a preliminary injunction on June 5, 2026. Shoreline Dkts. 2, 18.

Because Shoreline's and Seattle Plaintiffs' motions present overlapping challenges to substantially similar grant conditions, the Court permitted consolidated briefing. Seattle Dkt. 80; Shoreline Dkt. 15. Shoreline's motion was briefed together with Seattle Plaintiffs' second motion for preliminary injunction, and DOT filed an authorized surreply limited to two additional arguments raised by Shoreline in the consolidated reply.

### III.      FACTUAL BACKGROUND

**A.      Plaintiffs[4] Receive Federal Funding through Federal Agency Grants**

Each year, Congress exercises its constitutional power of the purse by enacting annual appropriations legislation that allocates taxpayer funds to federal agencies and specifies the

---

[3] Seattle Plaintiffs also filed a stipulated motion for leave to exceed the page limits set forth in the Court's Standing Order. Dkt. 60. The Court grants the motion.

[4] Reference to "Plaintiffs" in this Order refers to Seattle Plaintiffs and Shoreline, collectively.

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 4

purposes for which those funds may be used. Plaintiffs allege that they rely on funding from these agencies to support a wide array of programs and services for their residents.

### 1.    DOT Grants

Shoreline claims that, in 2023, DOT through FHWA awarded the city a $20 million Rebuilding American Infrastructure with Sustainability and Equity ("RAISE") grant for its "West Side Transformation: Multimodal Connections to the Shoreline South Regional Transit Hub" project. Shoreline Dkt. No. 2 ¶¶ 2, 26. According to Shoreline, the project is designed to improve traffic flow, pedestrian and bicycle safety, ADA accessibility, transit access, and connectivity to a light rail station. *Id*. ¶¶ 30–35.

Cleveland asserts that it "relies heavily on federal grant funds to support its transit and critical infrastructure projects." Seattle Dkt. No. 42 ¶ 150. Cleveland currently has approximately $234 million in active transportation-related federal grants, including approximately $30 million in FAA funding for airport projects involving wildlife-fence reconstruction, terminal tunnel rehabilitation, taxiway construction, and stormwater improvements. *Id*. ¶¶ 150–51. The city also has approximately $4.7 million in Safe Streets and Roads for All ("SS4A") funding and $1,820,500 in Strengthening Mobility and Revolutionizing Transportation ("SMART") funding for traffic signal technology, emergency vehicle preemption, pedestrian detection, and transit efficiency improvements. *Id*. ¶¶ 153–56.

Durham claims that DOT funding supports two major transportation projects for the city: a $12 million RAISE grant to improve pedestrian crossings, bus stops, ADA access, and transit connections in East Durham, and more than $6 million in funding for nine new GoDurham buses. *Id*. ¶¶ 256–58. Prince George's County likewise asserts that DOT provided it nearly $25

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 5

million in 2025 for transit and infrastructure projects, including SS4A funding to improve roadway safety and pedestrian safety along high-injury roads. *Id*. ¶¶ 315–18.

### 2.    HUD Grants

Cleveland alleges that it relies on HUD funding from Community Development Block Grants ("CDBG"), Emergency Solutions Grants ("ESG"), Housing Opportunities for Persons with AIDS ("HOPWA"), and HOME Investment Partnerships ("HOME") to support critical programs, such as after-school programs, job readiness for at-risk youth, home repair projects, hunger and wellness programs, adult literacy, and senior socialization networks. *Id*. ¶¶ 157–58. Its fiscal year 2025 awards include $19,463,970 in CDBG funding, $1,842,356 in ESG funding, $4,257,956.71 in HOME funding, and $2,368,588 in HOPWA funding. *Id*. ¶¶ 159, 161, 165, 170.

Durham asserts that it receives approximately $2 million annually in HUD CDBG funds and currently has $2,159,545.34 in active CDBG or Community Development Block Grant-Coronavirus ("CDBG-CV") grants, of which $1,818,165.71 has been committed. *Id*. ¶ 250. Durham further claims that it has been awarded an additional $1,936,725 in CDBG funds pending finalization of its 2025 grant agreement and expects to apply for approximately $3.9 million in HUD Continuum of Care funding. *Id*. ¶¶ 250, 255. Among other things, this funding enables the city to ensure that properties in low- and moderate-income neighborhoods comply with the Durham's Housing Code, rehabilitate and preserve affordable rental housing, support low- and moderate-income residents in purchasing their first home; and support site improvements for the development of new affordable housing units. *Id*. ¶ 250.

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 6

Prince George's County alleges that HUD funds the County's Section 8 Housing Choice Voucher Program ("Section 8 HCV"), CDBG Program, ESG Program, and HOME Program. *Id*. ¶ 298. In 2025, HUD allocated $109,681,585 to the County's Section 8 HCV program and awarded $14,795,028 for CDBG, HOME, and emergency solutions funding. *Id*. ¶¶ 300–01. The County further asserts that its Housing Authority and Department of Housing and Community Development have incurred CDBG and HOME expenses in anticipation of federal reimbursement. *Id*. ¶ 304.

### 3.   DHS Grants

Cleveland asserts that DHS funds its BioWatch program, a system designed to provide early detection of airborne biological threats, particularly those linked to bioterrorism. *Id*. ¶¶ 183–84. DHS allegedly approved Cleveland's continued BioWatch application for January 28, 2026 through July 31, 2026, with a budget of $206,516. *Id*. ¶ 185.

Portland claims that it manages eleven active FEMA-funded DHS grants totaling nearly $12 million, including three direct awards, for emergency management planning, flood mitigation, and regional disaster response planning. *Id*. ¶ 261. Portland further asserts that it is the primary recipient and coordinator for Urban Area Security Initiative ("UASI") grants for the Portland Metropolitan Region, including a fiscal year 2025 UASI award of approximately $5,362,594. *Id*. ¶ 262.

Allegheny County alleges that DHS funds Emergency Services programs used for public-safety services, staff, training, and equipment. *Id*. ¶ 282. The County also claims that it receives UASI funding with adjacent jurisdictions for technical rescue training and preparedness for industrial accidents, commercial transit incidents, and other catastrophic events. *Id*. ¶¶ 286–88.

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 7

### 4.    DOJ Grants

Columbus asserts that DOJ supplies $6,504,438.44 in funding relied on by the city's Department of Public Safety and City Attorney's Office, including funding for nine full-time positions. *Id*. ¶¶ 227, 234. These grants support substance-use response and drug court programs, forensic and investigative work, sexual-assault kit and DNA backlog reduction, law-enforcement hiring and training, domestic violence services, victim advocacy, youth diversion, court technology, identification-document assistance, and prosecutor training. *Id*. ¶¶ 228–33.

Durham claims that its Police Department has received Community Oriented Policing Services ("COPS") micro-grant funding to support recruiting, public engagement, and marketing strategies designed to increase female and Hispanic representation within the Police Department. *Id*. ¶ 259. Portland alleges that it has eight active DOJ Bureau of Justice Assistance grants totaling approximately $8.6 million, which fund programs addressing gun violence, unlawful street racing, stolen vehicles, body-worn cameras, de-escalation and crisis response training, forensic technology, cold cases, and public safety. *Id*. ¶ 263.

Allegheny County asserts that DOJ funds programs administered by the Allegheny County Department of Human Services, including a $1.6 million LEAD/Comprehensive Opioid, Stimulant, and Substance Use Site-Based Program grant, a $2 million READI community-based violence intervention grant, and Bureau of Justice Assistance funding for substance-abuse treatment and reentry outcomes. *Id*. ¶¶ 270–72. The County also identifies DOJ and Office of Justice Programs funding for sexual-assault kit initiatives, DNA backlog reduction, and Justice Assistance Grants for law enforcement. *Id*. ¶¶ 275–81.

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 8

Hennepin County claims that its 2026 budget includes $1.9 million in DOJ grants, including a grant that funds three positions in the Hennepin County Sheriff's Office for DNA processing operations. *Id*. ¶ 289. Hennepin County further asserts that it anticipates needing DOJ funding on an ongoing basis. *Id*. ¶ 294. Ramsey County similarly claims that it receives DOJ funding through direct and pass-through multi-year awards totaling more than $7 million from 2022 into 2027. *Id*. ¶ 324. Those funds support sexual-assault response protocols, violence reduction, law-enforcement mental-health services, crime-victim services, and equipment and communications systems for crime response and prevention. *Id*. Ramsey County also asserts that it receives DOJ Violence Against Women Act and Crime Victim Services funds that support sexual-assault crisis advocacy, counseling, outreach, and education for approximately 900 victims annually. *Id*. ¶ 325.

### 5.    HHS and HRSA Grants

Cleveland alleges that HRSA funds its MomsFirst Project through the Healthy Start Initiative. *Id*. ¶¶ 173–82. MomsFirst services address health issues, nutrition, safe sleeping, smoking cessation, healthy birthweight, prenatal care, child development, fatherhood support, housing and income resources, childcare, and safety. *Id*. ¶ 178. Cleveland claims that it is in the second year of a five-year HRSA award providing $1.1 million annually from May 1, 2024 through March 2029. *Id*. ¶ 179.

Prince George's County asserts that its Health Department received approximately $25 million in HHS funding in fiscal year 2025. *Id*. ¶ 308. The County claims that this funding supports programs including WIC, System of Care, Healthy Transitions, Bright Beginnings, Tobacco Control, and Chronic Disease Management. *Id*. ¶¶ 309–10. These programs provide

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 9

targeted support to vulnerable groups including infants, people with substance use disorders and people with chronic diseases. *Id*. ¶ 309.

### 6.    USDA Grants

Columbus claims that Department of Agriculture funding supports its WIC and summer food programs. *Id*. ¶¶ 210–14. It identifies a $7.39 million WIC subgrant that supports 63 full-time equivalent positions and 11 clinics serving 30,000 vulnerable participants annually, as well as a Summer Food Service Program that provides more than 195,000 meals to children. *Id*.

Hennepin County asserts that its 2026 budget includes $19.9 million in USDA grants supporting WIC nutrition and breastfeeding services for low-income pregnant women, new mothers, babies, and children, as well as the National School Lunch Program and School Breakfast Program in the County's juvenile detention center. *Id*. ¶¶ 289–92.

Ramsey County claims that it receives more than $16 million in USDA pass-through multi-year grant awards from 2022 through 2026. *Id*. ¶ 322. Those funds support supplemental food, nutrition, breastfeeding, health assessment, nutrition education, and community referral services for eligible pregnant women, new mothers, babies, and young children. *Id*. Ramsey County further asserts that it receives USDA reimbursement for SNAP administrative costs, with expected federal reimbursement of roughly $1.8 million for the first quarter of 2026. *Id*. ¶ 323.

### 7.    EPA Grants

Columbus asserts that it receives $60,581,928 in EPA funding. *Id*. ¶ 219. This includes an initial $750,000 award to study the Southerly Wastewater Treatment Plant and assess ways to maintain water quality amid rapid growth, as well as a second $750,000 appropriation for 2026. *Id*. ¶¶ 220–23. The city claims that it has already contracted with an engineering firm and that an

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 10

inability to access reimbursement would immediately injure its budget and credibility. *Id*. ¶¶ 221–23. Columbus also identifies a $1 million Climate Pollution Reduction Planning grant for June 1, 2023 through May 31, 2027, which funds regional climate mitigation planning to reduce greenhouse gas emissions and co-pollutants. *Id*. ¶¶ 224–26.

### 8.    DOE Grants

Columbus identifies a $778,900 Energy Efficiency and Conservation Block Grant administered by the Columbus Region Green Fund to assist low-income and disadvantaged communities with technical energy audits for affordable housing. *Id*. ¶¶ 238–39. Columbus further claims that it received $156,193 for energy-efficiency upgrades at the Blackburn Community Center and $250,000 for energy-efficiency retrofits at the Espy Adaptive Sports Complex and Cleo Dumaree Athletic Complex. *Id*. ¶¶ 240–44.

### 9.    DOL Grants

Ramsey County alleges that it receives more than $1.2 million in pass-through multi-year DOL awards through Workforce Innovation and Opportunity Act programs and those funds support employment and training services for dislocated workers, young adults ages 14 to 24, and adults facing significant barriers to employment. *Id*. ¶ 326. Ramsey County claims that it anticipates requiring DOL funding on an ongoing basis. *Id*. ¶ 327.

### 10.    Other Federal Grant Programs Identified as Threatened

Columbus alleges that it was awarded $187 million in American Rescue Plan Act of 2021 ("ARPA") funding from the Department of Treasury, of which $1.66 million remains obligated but unexpended for youth programming, human services, community improvements, and public utility assistance. *Id*. ¶ 194. Columbus also alleges that it received $2.3 million in ARPA funding

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 11

through Ohio's Lead Safe Ohio program for lead-safe renovation, abatement, mitigation, and related equipment in homes, congregate-care settings, and childcare facilities. *Id*. ¶¶ 215–16. Finally, Columbus alleges that the Consumer Product Safety Commission provides $200,000 for the 2024–2026 Pool Safety Grant Program, which is the only funding available to implement and enforce safety standards for residential and commercial pool construction and maintenance. *Id*. ¶¶ 235–37.

### B.     The DEI and Gender Orders

Within the first 100 days of starting his second term, President Donald Trump issued over 140 executive orders. Two of those orders form the basis of Plaintiffs' current motions.

### 1.     The DEI Order

On January 21, 2025, President Trump issued the DEI Order, the stated purpose of which is to "protect individual Americans" by "ending illegal preferences and discrimination" in the federal government and private sectors. DEI Order, Secs. 1 & 2. According to the DEI Order, "the Federal Government, major corporations, financial institutions, the medical industry, large commercial airlines, law enforcement agencies, and institutions of higher education have adopted and actively use dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) [policies]." *Id*. at Sec. 1. The DEI Order claims that these DEI and DEIA policies are "illegal," "violate the text and spirit of our longstanding Federal civil-rights laws," and "threaten the safety of American men, women, and children[.]" *Id*. at Sec. 1. The DEI Order instructs "all executive departments and agencies [] to terminate all

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 12

discriminatory and illegal preferences," "enforce [] longstanding civil-rights laws," and "combat illegal private-sector DEI preferences." *Id*. at Sec. 2.

Section 3(b)(iv) requires the head of each federal agency to include in every contract or grant award:

> (A) A term requiring the contractual counterparty or grant recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code [the "False Claims Act"]; and

> (B) A term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws.

Sec. 3(b)(iv)(A), (B).

### 2.    The Gender Order

Also in January 2025, President Trump issued the Gender Order. The Gender Order states that it is "the policy of the United States to recognize two sexes, male and female" and that these "sexes are not changeable and are grounded in fundamental and incontrovertible reality." Gender Order, Sec. 2. The Order further states that:

> 'Gender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

*Id*. at Sec. 2(f).

The Gender Order directs federal agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology" and further directs that "[f]ederal funds shall

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 13

not be used to promote gender ideology." *Id*. at Sec. 3(e), (g). To that end, Section 3(g) instructs each federal agency to "assess grant conditions and grantee preferences and ensure that grant funds do not promote gender ideology."

### C.    Federal Agencies Impose New Grant Conditions

Plaintiffs allege that Defendants have transformed grant programs Congress funded to support critical infrastructure, public safety, nutritional assistance, emergency services, and other public programs into vehicles for enforcing the Trump Administration's policy agenda. According to Plaintiffs, after issuance of the DEI and Gender Orders, multiple federal agencies began incorporating Section 3(b)(iv) of the DEI Order, Section 3(g) of the Gender Order, or materially similar language into federal grant terms and conditions. Plaintiffs allege that those conditions now appear across grants administered by DOT, HUD, DHS, DOJ, HHS, HRSA, USDA, EPA, DOE, DOL, and other agencies. *See* Seattle Dkt. No. 42 ¶¶ 74–113; Shoreline Dkt. No. 2 ¶¶ 59–83.

Plaintiffs further allege that Defendants' implementation of the challenged conditions has created immediate uncertainty over whether they may continue to accept, draw down, or rely on federal funds without exposing themselves to audits, repayment demands, grant termination, False Claims Act liability, or other enforcement consequences. That uncertainty is particularly acute, Plaintiffs contend, because many of the affected grants are reimbursable, requiring them to commit and expend local funds before seeking federal reimbursement, while other funds are necessary to advance ongoing capital projects and preserve related funding streams. *See*, *e.g.*, Seattle Dkt. No. 42 ¶¶ 1, 145-330; Shoreline Dkt. No. 2 ¶¶ 87–96. Plaintiffs allege that the challenged conditions are disrupting budgeting, planning, and project implementation in real

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 14

time by forcing them to choose between accepting conditions they contend are unlawful or declining those conditions and risking the loss of federal funds already incorporated into public programs, services, and projects. *See*, *e.g.*, Seattle Dkt. No. 42 ¶¶ 257–58, 260, 320–21; Shoreline Dkt. No. 2 ¶ 93. Plaintiffs assert that they have suffered, and will continue to suffer, irreparable harm as a result of Defendants' actions. They therefore request that the Court enjoin Defendants from enforcing Section 3(b)(iv) of the DEI Order and Section 3(g) of the Gender Order in connection with any grants to Plaintiffs.

## IV.    DISCUSSION

### A.    Legal Standard

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking preliminary injunctive relief must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id*. at 20. An injunction may also be awarded where "the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in [the plaintiff's] favor," provided that the plaintiff can also demonstrate the other two *Winter* factors. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011) (citation and internal quotation marks omitted). Under either standard, the plaintiff bears "the burden of making a clear showing that [it is] entitled to this extraordinary remedy." *California v. Trump*, 379 F. Supp. 3d 928, 937 (N.D. Cal. 2019) (citing *Earth Island Inst. v. Carlton*, 626 F.3d

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 15

462, 469 (9th Cir. 2010)). "The most important *Winter* factor is likelihood of success on the merits." *Id*. (citing *Disney Enters., Inc. v. VidAngel, Inc*., 869 F.3d 848, 856 (9th Cir. 2017)).

In considering the likelihood of success on the merits, the court is not strictly bound by the rules of evidence, as the "preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). "Because of the extraordinary nature of injunctive relief, including the potential for irreparable injury if not granted, a district court may consider evidence outside the normal rules of evidence, including: hearsay, exhibits, declarations, and pleadings." *Nat'l Rifle Assoc. of Am. v. City of Los Angeles*, 441 F. Supp. 3d 915, 926 (C.D. Cal. 2019) (citing *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009)).

**B.       Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims**

The APA broadly "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). Under the APA, agencies must "engage in reasoned decisionmaking," *National Urban League v. Ross*, 977 F.3d 770, 779 (9th Cir. 2020) (internal quotation marks omitted), and courts are empowered to "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, contrary to constitutional right, or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2).

Plaintiffs challenge agency actions imposing grant conditions that seek to implement the same DEI and Gender Order provisions this Court previously considered in *City of Seattle* and in *King County v. Turner*. *See*, *e.g.*, 2025 WL 2322763 (W.D. Wash. Aug. 12, 2025). The present

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 16

motions involve additional Plaintiffs, additional agency Defendants, and Shoreline's grant-specific challenge to DOT/FHWA conditions attached to its RAISE grant. But those differences do not materially alter the APA analysis. The challenged conditions continue to impose substantially similar requirements: recipients must certify that they do not operate DEI programs that violate, or that Defendants contend violate, federal antidiscrimination laws; agree that compliance with federal antidiscrimination laws is material to federal payment decisions for purposes of the False Claims Act; and, in some instances, accept restrictions concerning "gender ideology." Defendants still have not identified statutory authority permitting the relevant agencies to impose those conditions across the grant programs at issue, nor have they supplied a reasoned explanation tying those conditions to the statutory purposes of the affected grants. The Court therefore again concludes that Plaintiffs are likely to succeed on the merits of their APA claims.

### 1. The challenged conditions are contrary to law and in excess of statutory authority

The Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). The Appropriations Clause serves the "fundamental and comprehensive purpose" of ensuring that public funds are spent according to Congress's judgments, not "according to the individual favor of Government agents." *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016) (quoting *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990)). And an executive agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Thus, the relevant question is whether

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 17

Congress authorized Defendants to impose these particular grant conditions on programs Congress funded for distinct statutory purposes.

Defendants rely principally on agencies' general authority to administer grants and require compliance with existing federal civil-rights laws to argue that they can do so. But the challenged conditions do more than require compliance with existing law. They require recipients to accept the Administration's disputed framing of DEI and "gender ideology," to certify compliance with undefined or disputed restrictions, and to agree in advance that compliance "in all respects" with federal antidiscrimination law is material to federal payment decisions for purposes of the False Claims Act. General grant-administration authority and existing civil-rights statutes do not authorize agencies to impose new, cross-cutting conditions untethered from the purposes Congress specified for the relevant grant programs. Nor do they authorize agencies to leverage congressionally appropriated funds to advance policy objectives that Congress did not impose as conditions on those funds.

That conclusion applies with particular force to the record now before the Court. The affected grants fund transportation infrastructure, emergency preparedness, housing and community development, public safety, health care, nutrition, workforce services, and other congressionally authorized programs. Shoreline's RAISE grant, for example, was awarded to support multimodal transportation improvements around a regional transit station. Defendants do not explain how the challenged DEI/FCA certification requirements or the Gender Order restrictions further the statutory purposes of that grant program. Nor do Defendants identify statutory authority allowing DOT, FHWA, or the other agencies at issue to impose those requirements as conditions on funds Congress appropriated for distinct programmatic purposes.

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 18

Plaintiffs are therefore likely to succeed on their claims that the challenged agency actions are contrary to law and in excess of statutory authority.

### 2. The challenged conditions are arbitrary and capricious

The APA requires agency action to be "reasonable and reasonably explained," *Ohio v. EPA*, 603 U.S. 279, 292 (2024), and an agency must "examine the relevant data and articulate a satisfactory explanation for its action," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency acts arbitrarily and capriciously when it relies on factors Congress did not intend it to consider, fails to consider an important aspect of the problem, or offers an explanation that runs counter to the evidence before it. *Id*.

Here, the challenged conditions bear no apparent relationship to the grant programs at issue. Defendants have not adequately explained why funds appropriated for transportation infrastructure, emergency preparedness, housing, nutrition, public safety, workforce development, and similar programs must be conditioned on compliance with the challenged DEI and Gender Order requirements. Nor have Defendants shown that the agencies considered the statutory purposes of the affected grants, the reliance interests of recipients with existing awards and ongoing projects, the consequences of imposing new conditions on reimbursable grants, or the uncertainty created by broad certifications carrying potential False Claims Act consequences. Nor have they considered the effects of removing the grants on Plaintiffs' vulnerable populations. The Court therefore concludes, as it did in its prior orders, that Plaintiffs are likely to succeed on their claims that the challenged agency actions are arbitrary and capricious.

Defendants argue that the Fourth Circuit's decision in *National Association of Diversity Officers in Higher Education v. Trump*, 167 F.4th 86 (4th Cir. 2026) ("*NADOHE*"), undermines

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 19

Plaintiffs' challenge to the DEI Order. It does not. *NADOHE* involved a First Amendment facial challenge to the DEI Order and another executive order not at issue here, and the Fourth Circuit concluded that the district court erred in entering a facial injunction in that posture. *Id*. at 101–04. This case is materially different. Plaintiffs do not ask the Court, under the APA, to directly review the President's issuance of the DEI or Gender Orders in the abstract. Rather, they challenge agency actions implementing the challenged provisions through federal grant terms and conditions. That distinction matters. The APA inquiry here asks whether the agencies acted within their statutory authority, complied with limits on the imposition of federal funding conditions, and engaged in reasoned decisionmaking. *NADOHE*, which is not binding on this Court and arose under a different legal framework, does not disturb this Court's conclusion that Plaintiffs are likely to succeed on their APA claims.

Nor does DOT's surreply to Shoreline's motion alter this conclusion. DOT argues that Shoreline is unlikely to succeed on two additional theories raised in the consolidated reply: a nonstatutory *ultra vires* claim and an APA claim under § 706(2)(D) based on DOT's alleged failure to follow its own rulemaking procedures. The Court need not resolve those additional theories at this stage. The preliminary injunction rests on the APA grounds discussed above: Plaintiffs have shown that the challenged agency actions are likely contrary to law, in excess of statutory authority, and arbitrary and capricious. DOT's arguments concerning Shoreline's separate *ultra vires* and procedural theories therefore do not undermine Plaintiffs' showing of likely success on the merits.[5]

---

[5] Because Plaintiffs are likely to succeed on their APA claims, the Court need not, and indeed should not, resolve the independent constitutional challenges also asserted by Plaintiffs. *See, e.g., Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 2024 WL 5692756, at *14 (9th Cir. May 14, 2025) (recognizing the principle of avoiding unnecessary

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 20

### C.  Irreparable Injury

A plaintiff seeking a preliminary injunction must establish that it is likely to suffer imminent, irreparable harm in the absence of preliminary relief. *Winter*, 555 U.S. at 20. Such harm "is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (citing *Rent–A–Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir.1991)). A plaintiff must demonstrate an "immediate threatened injury as a prerequisite to preliminary injunctive relief." *Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980).

As an initial matter, Defendants argue that Seattle Plaintiffs cannot meet this burden as to five of the newly added Plaintiffs—Portland, Columbus, Allegheny County, Hennepin County, and Ramsey County—because those Plaintiffs are also plaintiffs in *King County v. Turner*, where DOT, HUD, and HHS have already been enjoined from enforcing certain challenged grant conditions. Defendants therefore contend that those Plaintiffs cannot show imminent harm from those agencies or conditions. This argument does not defeat Plaintiffs' showing of irreparable harm. Seattle Plaintiffs have expressly accounted for the overlap in their proposed order and do not seek duplicative relief for plaintiffs already protected by the injunction in *King County*. *See* Seattle Dkt. No. 61-1 at 6 ¶ 2.

---

constitutional rulings); *Washington v. Trump*, 441 F. Supp. 3d 1101, 1125 (W.D. Wash. 2020) ("[A] court should not reach a constitutional question if there is some other ground upon which to dispose of the case. Given that this Court has already determined that Defendants' [action] violates the APA and, therefore, can dispose of the case on that basis, the Court exercises restraint and declines to reach the constitutional claims raised by [Plaintiff].") (cleaned up, citing *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009); *Harmon v. Brucker*, 355 U.S. 579, 581 (1958)).

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 21

Defendants next argue that Seattle Plaintiffs cannot establish imminent, irreparable harm based on conditions that are no longer operative or are not presently being enforced. According to Defendants, Seattle Plaintiffs' reliance on the April 2025 HHS Grants Policy Statement is misplaced because that policy statement has been superseded and is no longer in effect. Defendants further argue that Seattle Plaintiffs cannot show a present threat of enforcement as to certain HHS and HUD conditions because those conditions are currently subject to an injunction entered by the District of Rhode Island. *See Rhode Island Coalition Against Domestic Violence, et al. v. Kennedy, Jr., et al.*, No. 1:25-cv-00342-MRD-PAS, 2025 WL 2988705 (D.R.I. Oct. 23, 2025). Defendants contend that, taken together, these developments undermine Seattle Plaintiffs' claim that they face an imminent risk of enforcement, funding loss, or other irreparable injury from those conditions.

Defendants are correct that Seattle Plaintiffs cannot rely on the April 2025 HHS Grants Policy Statement as an operative policy if that version has been superseded. However, as Seattle Plaintiffs point out, Defendants do not disavow their intent to enforce the challenged DEI Order provisions against them. Moreover, HHS's October 2025 Grants Policy Statement still mandates that recipients certify compliance with "all federal antidiscrimination laws" and further states that doing so "is a material condition of receiving" federal funds.[6] Nor does the Court ignore that certain HHS and HUD conditions are presently subject to an injunction entered by the District of Rhode Island. However, that injunction does not defeat Seattle Plaintiffs' showing of irreparable harm. Their alleged injuries are not confined to the HHS and HUD conditions addressed in

---

[6] *HHS Grants Policy Statement*, DEP'T OF HEALTH & HUM. SERVS. (Oct. 1, 2025), https://www.hhs.gov/sites/default/files/hhs-grants-policy-statement-oct-2025.pdf.

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 22

Rhode Island; rather, Seattle Plaintiffs identify current and threatened conditions imposed through multiple agencies and grant programs. Furthermore, an injunction entered in another case does not eliminate the uncertainty, compliance burdens, or risk of future enforcement Seattle Plaintiffs allege, particularly where Defendants continue to defend the challenged conditions and have not disavowed imposing the same or materially similar requirements through other grant mechanisms. *See California v. Health & Human Servs.*, 390 F. Supp. 3d 1061, 1066 (N.D. Cal. 2019) ("[T]he existence of another injunction—particularly one in a different circuit that could be overturned or limited at any time—does not negate [Plaintiffs'] claimed irreparable harm.").

Defendants' remaining irreparable-harm arguments fare no better. Defendants contend that the asserted injuries are speculative because no Plaintiff has yet lost funding and because Plaintiffs could avoid injury by accepting the challenged conditions while this litigation proceeds. The Court has considered and rejected materially identical arguments before. Plaintiffs are not required to wait until federal funds are terminated, projects are halted, or enforcement proceedings are initiated before seeking preliminary relief. The injury alleged here is the present and coercive choice Defendants have imposed: Plaintiffs must either accept conditions they contend are unlawful and expose themselves to audits, repayment demands, termination, and False Claims Act consequences, or refuse the conditions and risk losing funds on which they rely to provide critical public services and complete ongoing projects. That uncertainty is not abstract. Plaintiffs are committed to projects that affect the welfare of populations relying on them for responsible governance that involves budgeting, grant administration, program planning, and the ability to commit funds in real time.

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 23

Nor is the alleged harm merely monetary or otherwise reparable after final judgment. Plaintiffs have submitted detailed evidence that the challenged conditions threaten funding used for public safety, emergency preparedness, transportation infrastructure, housing, health care, workforce development, and other essential services. The disruption of those programs, the inability to plan around committed federal reimbursements, the potential termination or delay of multi-year public works projects, and the loss or interruption of services to vulnerable residents are quintessentially irreparable injuries. The Court therefore again concludes that Plaintiffs have established a likelihood of imminent, irreparable harm absent preliminary relief.

**D.    Balance of Equities and Public Interest Favor Plaintiffs**

In deciding whether to grant an injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Courts "explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (quoting *Rostker v. Goldberg*, 448 U.S. 1306, 1308 (1980) (internal quotation marks and citation omitted). Where the government is a party, the balance of equities and public interest factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

The Court concludes that the balance of equities and public interest favor preliminary relief. Defendants argue that an injunction would interfere with the Executive Branch's ability to effectuate policy, ensure that recipients comply with federal law, and prevent federal funds from being spent for unauthorized purposes. But this Court has already rejected the contention that Plaintiffs' threatened harms are merely monetary or otherwise reparable after final judgment.

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 24

Defendants' asserted interests also do not outweigh the irreparable harm Plaintiffs have shown. Although the federal government has a legitimate interest in enforcing federal law and ensuring that grant funds are used for authorized purposes, it has no legitimate interest in enforcing grant conditions that were likely imposed in violation of the APA. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).

Defendants' reliance on *Dalton v. Specter* does not change that conclusion. The Court need not treat every alleged statutory violation as a constitutional violation to conclude that the equities favor relief. Plaintiffs have shown that Defendants likely exceeded their lawful authority and acted contrary to the APA, and the public interest is served by requiring federal agencies to act within the bounds Congress has set. Nor would an injunction prevent Defendants from enforcing generally applicable civil-rights laws, recouping funds spent for unauthorized purposes, or terminating grants on lawful grounds. It would simply preserve the status quo by preventing Defendants from imposing or enforcing the challenged conditions while this litigation proceeds. For these reasons, and those discussed above, the balance of equities and public interest weigh sharply in Plaintiffs' favor.

**E.      The Court Denies Defendants' Request for a Bond and Request to Stay**

Defendants request that if this Court issues an injunction, it be stayed pending any appeal and/or the Ninth Circuit's decision in *King County v. Turner*. Defendants further request that this Court require Plaintiffs to post a bond for the value of the grants subject to the injunction pursuant to Fed. R. Civ. P. 65(c). The Court denies both requests. Defendants have not met the standard for a stay. *See*, *e.g.*, *Maryland v. Dep't of Agriculture*, JKB-25-0748, 2025 WL 800216, at *26 (D. Md. Mar. 13, 2025) ("It is generally logically inconsistent for a court to issue a TRO

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 25

or preliminary injunction and then stay that order, as the findings on which those decisions are premised are almost perfect opposites."). Nor have Defendants demonstrated that they will suffer any material harm from the injunction the Court issues today. "Despite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (citations and internal quotation marks omitted, emphasis in original). "In particular, the district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id*. (cleaned up). Therefore, the Court denies Defendants' requests for a bond and to stay the injunction.

## V.    CONCLUSION

For the foregoing reasons:

1.    Seattle Plaintiffs' Motion for a Preliminary Injunction (Seattle Dkt. 61) is GRANTED;

2.    Shoreline's Motion for a Preliminary Injunction (Shoreline Dkt. 18) is GRANTED;

3.    Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them and all other federal Departments and Agencies are enjoined from enforcing Section 3(b)(iv) of the DEI Order and Section 3(g) of the Gender Order against Seattle Plaintiffs.  This Order does not affect any relief granted to Plaintiffs Columbus, Portland, Allegheny County, Hennepin County, and Ramsey County in *King County et al. v. Turner et al*., No. 2:25-cv-00814-BJR (W.D. Wash. 2025) with respect to Defendants DOT,

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 26

HUD, and DHHS, or any relief granted to Plaintiffs Hennepin County and Ramsey County in *Chicago v. Noem* (N.D. Ill. 25-cv-12765) with respect to Defendant DHS;

4.      Defendant DOT, its officials, agents, employees, assigns, and all persons acting in concert or participating with them and all other federal Departments and Agencies are enjoined from enforcing the DOT Conditions or any other actions taken pursuant to Section 3(b)(iv) of the DEI Order and Section 3(g) of the Gender Ideology Order against Shoreline;

5.      Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them and all other federal Departments and Agencies shall immediately treat any actions taken to implement or enforce Section 3(b)(iv) of the DEI Order and Section 3(g) of the Gender Order against Seattle Plaintiffs and Shoreline as null, void, and rescinded, and may not retroactively apply such conditions to grant agreements executed during the effective period of this preliminary injunction.  Defendants shall immediately take every step necessary to effectuate this order, including clearing any administrative, operational, or technical hurdles to implementation;

6.      Defendants' counsel shall provide written notice of this Order to all Defendants, agencies, and their employees and contractors involved in grantmaking or enforcement of grant terms on the third day court day following issuance of this Order;

7.      By the end of the third court day after issuance of this Order, Defendants shall file on this Court's electronic docket and serve upon Plaintiffs a Status Report documenting the actions they have taken to comply with this Order, including a copy of the notice and an explanation as to whom the notice was sent; and

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 27

8.    This Order shall remain in effect pending further orders from this Court.

IT IS SO ORDERED.

Dated this 29th day of June 2026.

Barbara Jacobs Rothstein
U.S. District Court Judge

ORDER GRANTING SEATTLE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND THE CITY OF SHORELINE'S MOTION FOR A PRELIMINARY INJUNCTION

- 28